UNITED STATES of America, Appellee,

v.

James SUTERA, Appellant.

No. 90–2479.

United States Court of Appeals,
Eighth Circuit.

Submitted March 11, 1991.

Decided May 15, 1991.

John M. Torrence, Kansas City, Mo., for appellant.

Paul S. Becker, Kansas City, Mo., for appellee.

Before FAGG and LOKEN, Circuit Judges, and SNEED *, Senior Circuit Judge.

SNEED, Senior Circuit Judge:

James Sutera appeals his convictions under 18 U.S.C. §§ 1955, 1084, 1956(a)(1)(B)(i) (1988) for money laundering and various gambling related offenses. We affirm.

## I.

## FACTS AND PROCEEDINGS BELOW

The investigation leading to Sutera's convictions began in the spring of 1988. At that time, the Federal Bureau of Investigation (FBI) commenced surveillance of Carlo Cavallaro, a Kansas City bookmaker and a

* Honorable Joseph T. Sneed, Senior Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

suspected organized crime figure who frequently was seen entering a restaurant owned by appellant's family, the Sutera Old San Francisco Restaurant, located in the "west bottoms" area of Kansas City. This led to an investigation of possible gambling activity at another Sutera family-owned restaurant, the Brookside Restaurant. An FBI agent and a detective from the Kansas City Police Department frequented this restaurant where they witnessed sports gambling activity in the bar of the restaurant. There was frequent discussion of past and upcoming games; employees of the restaurant were seen passing "line" sheets to customers; and both saw occasional exchanges of envelopes that appeared to contain money.

Thereafter, the FBI placed court authorized pen registers and wiretaps on the Brookside restaurant, James Sutera's home phone, and phones belonging to other defendants named in the indictment. These devices revealed that Edward Searing was operating a central bookmaking network consisting of other bookmakers, of which Sutera was one, and numerous players. Sutera received bets for the Searing network and his "own" players. Some who placed bets with Sutera on their own behalf also placed bets with him on behalf of a group of players.

On October 13, 1989, the grand jury indicted Sutera, Searing, and four others, for various offenses related to their gambling business. Sutera was indicted for the following four offenses:

1) Operating an illegal gambling business.
2) Using interstate wire facilities to transmit betting information while engaged in the business of gambling.
3) Failure to pay a special gambling tax.
4) Money laundering.

Sutera's case was tried before a jury which returned guilty verdicts on all counts of the indictment in March, 1990. Under the sentencing guidelines, Sutera was sentenced to thirty-three months for the money laundering charge.[1]

## II.

## JURISDICTION

We have jurisdiction over this appeal under 28 U.S.C. § 1291 (1988).

## III.

## DISCUSSION

Sutera alleges that the trial court made four errors, each of which would provide a basis for reversal:

1) That the trial court's instruction to the jury on money laundering constituted an impermissible amendment of the indictment.
2) That the trial court erred in failing to grant defendant's motion to suppress statements made by Sutera to the FBI.
3) That the evidence was insufficient to support a conviction for money laundering.
4) That the trial court erred when it enhanced Sutera's offense levels based on his level of participation in the various gambling enterprises.

We find that none constitutes reversible error.

### A. *The Indictment Issue*

█ This issue can best be presented by setting forth, first, the indictment and, next, the alleged faulty jury charge. Count twenty-four of the indictment reads:

On or about February 10, 1988 ... defendant JAMES SUTERA, knowing that the property involved in a financial transaction represented the proceeds of an unlawful activity as defined in Title 18, United States Code, Section 1956(c)(1), that is, an *illegal gambling business* in violation of Title 18, United States Code, Section 1955, did deposit a check which was the proceeds of the

---

1. Because the sentences will be served concurrently, the money laundering sentence controls because it carries the longest term. Sutera was sentenced to eighteen months for operating an illegal gambling business and twenty-one months for using interstate wire facilities to transmit gambling information. He was also fined $7500 for operating the illegal gambling business and $2500 for failing to pay the gambling tax.

illegal gambling business into a bank account in the name of Sutera's Enterprises, knowing that the transaction was designed in whole or part to conceal and disguise the nature, location, source, ownership and control of the proceeds of the illegal gambling business.

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

Appendix for Appellant at 29 (emphasis added). Counts twenty-five and twenty-six are identical except the dates are different.

The jury charge on money laundering is as follows:

Four essential elements are required to be proved beyond a reasonable doubt in order to establish the offenses charged in Counts Twenty-four, Twenty-five and Twenty-six of the Indictment:

One: that the defendant Sutera conducted a financial transaction through or by a financial institution which is engaged in or whose activities affect interstate commerce in any way or degree;

Two: that the defendant Sutera knew that the checks involved were the proceeds of a *bookmaking activity;*

Three: that the defendant Sutera knew the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds; and

Four: that the transaction did involve the proceeds of illegal bookmaking activity.

Jury Instruction No. CC, Appendix for Appellant at 58 (emphasis added). Appellant contends that the above instruction improperly amended the indictment because it embraced proceeds of "a bookmaking activity" rather than an "illegal gambling business." This change, he argues, violated his Fifth Amendment right to be charged by a grand jury.[2] We disagree.

To understand the statutory framework fixing the form of the indictment we begin by noting that Sutera was specifically charged with violating section 1956(a)(1), which reads:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of *some form of unlawful activity,* conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of *specified unlawful activity* ... knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of *specified unlawful activity* ... shall be sentenced to a fine ... or imprisonment for not more than twenty years, or both. (emphasis added).

Section 1956(c)(1), also charged in the indictment, defines "some form of unlawful activity" as "some form, though not necessarily which form, of activity that constitutes a felony under State, Federal or foreign law, regardless of whether or not such activity is specified in paragraph (7)." 18 U.S.C. § 1956(c)(1) (1988). Paragraph seven further indicates, in part, that "specified unlawful activity," another term set forth in section 1956(a)(1), means "any act or activity constituting an offense listed in section 1961(1) of this title." *Id.* § 1956(c)(7)(A).

Turning to section 1961(1), to amplify the scope of the foregoing section 1956(c)(7)(A), we find that it sets forth a long list of acts that constitute "racketeering activity." Subsection A includes "any act or threat involving ... gambling ... which is chargeable under state law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A) (1988). Under Missouri law, bookmaking satisfies this requirement. Bookmaking is one means of "promoting gambling" under Missouri law. *See* Mo.Ann.Stat. § 572.030.1(2) (Vernon 1991). Such activity constitutes a class D felony which carries a jail sentence not to exceed five years. *See id.* § 572.030.2; 558.011.1(4) (Vernon Supp.1991).

---

**2.** The defendant did not argue on appeal that he was prejudiced in the defense of his case because he lacked adequate notice of this change. We deem that such an argument has been waived on appeal and we do not address it. *See Jasperson v. Purolator Courier Corp.,* 765 F.2d 736, 740–41 (8th Cir.1985).

Subsection B of section 1961(1) includes acts indictable under section 1955, which discusses "illegal gambling businesses." 18 U.S.C. § 1961(1)(B). Section 1955(b)(1) provides the three elements of an "illegal gambling business":

1) A gambling business that violates the law of the state in which it is conducted,

2) which involves five or more persons who conduct, manage, supervise, or direct such business, and

3) has been in operation for more than thirty days or has a gross revenue that exceeds two thousand dollars in any one day.

18 U.S.C. § 1955(b)(1) (1988).

If Instruction CC had required the jury to find that Sutera had laundered the proceeds of an "illegal gambling business," then the instruction would have conformed in all respects to section 1956 and the other relevant statutory sections. Similarly, if the indictment had charged Sutera with laundering the proceeds of "bookmaking activity" and the jury instruction had used the same language, there would be no problem with the instruction. Laundering the proceeds of an illegal gambling business *or* a bookmaking operation is illegal under section 1956. The only question in this case is whether the variance between the indictment, which says "illegal gambling business," and the jury instruction, which says "bookmaking activity," constitutes reversible error. We find that it does not.

Defendant's principal complaint about the jury instruction is that by changing the illegal activity underlying the money laundering charge from an "illegal gambling business" to "illegal bookmaking activity," the judge amended the indictment. Defendant contends this amendment is illegal per se. *See Stirone v. United States*, 361 U.S. 212, 217–18, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960); *Ex parte Bain*, 121 U.S. 1, 10, 13, 7 S.Ct. 781, 786, 787, 30 L.Ed. 849 (1887), *overruled by United States v. Miller*, 471 U.S. 130, 138–44, 105 S.Ct. 1811, 1816–19, 85 L.Ed.2d 99 (1985); *United*

*States v. Yeo*, 739 F.2d 385, 387 (8th Cir. 1984).

Defendant's reliance on *Stirone* and *Bain* is misplaced. In *United States v. Miller*, the Court distinguished *Bain* and *Stirone* because both these cases involved indictments that were later *broadened* at trial. *See United States v. Miller*, 471 U.S. 130, 138–44, 105 S.Ct. 1811, 1816–19, 85 L.Ed.2d 99 (1985). In *Miller*, the Court overruled the language in *Bain* which suggested that *any* amendment of an indictment was illegal. *See id.* at 144, 105 S.Ct. at 1819. The Court concluded that trial evidence which narrows the indictment's charges without adding new offenses does not violate the Fifth Amendment. *Id.* at 131, 138–40, 105 S.Ct. at 1812, 1816–17. The Court held that Miller's conviction was acceptable because the trial proof only supported a "significantly narrower ... though included, fraudulent scheme." *Id.* at 131, 105 S.Ct. at 1812; *see id.* at 136, 138–40, 105 S.Ct. at 1815, 1816–17.

We reach the same conclusion in this case. The government simply narrowed the charge set forth in the indictment. The money laundering charge in the indictment was based on an *illegal gambling business*. To prove an illegal gambling business, the government must show, among other things, that the business violates state gambling laws. Bookmaking is an activity that violates state gambling laws. The jury was instructed to find whether Sutera laundered the proceeds of bookmaking activity. The laundering of proceeds from bookmaking activity is simply a narrower, but included, offense of laundering proceeds from an illegal gambling business.

This is true because of the following circumstances. The jury under Count 1, not at issue in this appeal, had found that Sutera operated an "illegal gambling business" from September through December of 1988. The term "illegal bookmaking activity" in the money laundering jury charge was used because the proof under Counts 24, 25, and 26 consisted of three checks deposited in February, April, and June 1988, respectively. Not proven by the

government, however, were two other requisite elements of an "illegal gambling business," i.e., the involvement of five or more persons and operations for a period exceeding thirty days for the period of February through June, 1988. This failure restricted Sutera's provable guilt to laundering proceeds from bookmaking activity. The judge's instructions accordingly narrowed the indictment in a constitutionally acceptable manner. *See Miller*, 471 U.S. at 144, 105 S.Ct. at 1819.

■ Sutera also claims that the intent portion of the jury instruction on money laundering was flawed because the jury could have found him guilty of a form of bookmaking that did not constitute a felony under state law. Such a finding would not support a money laundering conviction under section 1956. Sutera specifically complains that the second part of the instruction permits them to so find because it failed to modify the words "bookmaking activity" with the word "illegal."

■ Sutera would have us look at a single tree rather than the forest. The district court is afforded considerable discretion in formulating instructions to the jury. *See United States v. Jerde*, 841 F.2d 818, 820 (8th Cir.1988). Moreover, jury instructions are considered within the context of the whole trial, and in light of other instructions. *See United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975); *United States v. McMillan*, 820 F.2d 251, 256 (8th Cir.1987), *cert. denied*, 484 U.S. 898, 108 S.Ct. 234, 98 L.Ed.2d 193 (1987). The fourth part of the instruction at issue required the jury to find that the transaction did involve the "the proceeds of illegal bookmaking activity." Instruction No. CC, Appendix for Appellant at 58. Buttressing this is instruction I which clearly defined "bookmaking" as "a felony crime in the State of Missouri when conducted as a business rather than in a casual or personal fashion, and when a bookmaker or bookie accepts more than one bet in any day and accepts more than $100 in bets." Jury Instruction No. I, Volume Two of District Court File. We find

no reversible error in the jury instruction on money laundering in this case.

B. *Sutera's Motion to Suppress Statements*

■ Sutera's motion to suppress the statements he made on December 11, 1990 was denied. Sutera insists this was error because these statements were made in a custodial setting without *Miranda* warnings. The district court held that Sutera was not in custody at the time of the questioning, and therefore, no *Miranda* warnings were necessary.

■ We review the district court's determination on this issue under a clearly erroneous standard. *See United States v. Carter*, 884 F.2d 368, 370 (8th Cir.1989); *United States v. Jorgensen*, 871 F.2d 725, 728 (8th Cir.1989).

■ In determining whether a custodial interrogation has occurred, we consider the "totality of the circumstances." *See United States v. Helmel*, 769 F.2d 1306, 1320 (8th Cir.1985). Relevant factors in this determination include the "accused's freedom to leave the scene and the purpose, place and length of interrogation." *Id.* Other such factors include the subjective intent of the interrogating officer, the age and experience of the person interviewed, and the mode and manner of the questioning. *See United States v. Rorex*, 737 F.2d 753, 756 (8th Cir.1984).

On December 11, 1990, Agent King, Agent Burns, and four other law enforcement officers went to Sutera's apartment to execute a search warrant for the residence, Sutera's automobile, and the actual persons of Sutera and Richard Turner. After searching Sutera, the officers asked him if he was willing to talk to them about his gambling business. Sutera was informed that he was not under arrest, that he did not have to answer questions, and that he could leave at any time. Sutera indicated that he was willing to talk to the officers.

The officers conducted the interview in the bedroom because there were only three rooms in the apartment, and Richard Turn-

er, a potential codefendant, was in the kitchen. The door to the bedroom remained open throughout the interview. Sutera was free to move about the apartment during the execution of the search warrants and the interview, with the limitation that he not interfere with the officers' search or answer the telephone.

During the interview, Sutera referred to a phone number for a person with whom he had engaged in gambling activities, and informed the officers that the number was in an address book located at the Brookside restaurant. Sutera agreed to produce the address book, and Burns drove Sutera to the restaurant in an unmarked police vehicle and accompanied him into the restaurant to obtain the address book. Burns then drove Sutera back to the apartment where the interview resumed for approximately twenty minutes.

After interviewing Sutera and searching the apartment, the officers proceeded to search Sutera's automobile. Sutera was not allowed to use the automobile prior to this search.

The officers spent approximately three and one-half hours executing the entire search warrant. The interview of Sutera lasted approximately one hour. At no time did the officers inform Sutera of his *Miranda* rights.

■ While we find the absence of a "protective" *Miranda* warning somewhat puzzling, we cannot say that the district court's finding was clearly erroneous. Our holding is based on a number of observations. Except for the initial frisk, the officers did not use any force to restrain Sutera or to compel him to answer questions. On the contrary, the officers specifically informed Sutera that he was not under arrest, that he did not have to answer their questions, and that he was free to move around the apartment or leave anytime he wished. While not conclusive, an officer's comments on the freedom to decline to answer indicates noncustodial interrogation. *See United States v. Jones*, 630 F.2d 613, 616 (8th Cir.1980).

It is also relevant that Sutera was "on his own turf." *See Rorex*, 737 F.2d at 756.

Except for the brief period when Sutera and Burns drove to get the address book, Sutera was interviewed in the apartment that he was occupying. While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation. *See Helmel*, 769 F.2d at 1320.

Finally, we feel it is very important that the officers did not contemplate arresting Sutera either before or after the interview. *See Rorex*, 737 F.2d at 756. At the evidentiary hearing, Agent King testified on why Sutera was not given *Miranda* warnings, stating: "[Sutera] was not in custody. He was not under arrest. We did not contemplate an arrest during the interview, nor did we contemplate an arrest after the interview. There were no federal charges, formal federal charges pending at that time." Transcript of Evidentiary Hearing of Feb. 5, 1990, *United States v. Sutera*, No. 89–00162–05–CR–W–6, at 16 (W.D. Mo.). Based upon this testimony, as well as all other testimony presented at the evidentiary hearing, the district court agreed that the officers did not contemplate arresting Sutera, but rather merely interviewed him as part of their investigation. We see nothing in the record to indicate that the district court was wrong.

Sutera argues that despite all this, he was not free to leave because a number of factors, taken together, created a coercive police-dominated atmosphere. He claims that six armed officers entered his apartment, frisked him, searched his apartment, and prevented him from using his phone or his car during the search. Further, the officers interviewed him in isolation, Officer Burns accompanied him to retrieve the address book, and the officers used nonverbal expressions indicating that he was not free to leave.

Sutera's interpretation of the facts in this case is not persuasive. While all official questioning has some coercive aspects, *see Rorex*, 737 F.2d at 756, the record here is devoid of any evidence showing conduct by the officers which would lead to the conclusion that Sutera was in custody.

The officers were simply following routine police procedure in executing a search warrant. For example, the officers did not deny Sutera access to his car in order to demobilize him, but rather to protect the car's contents from tampering prior to the execution of the warrant. Additionally, Officer Burns drove Sutera to the Brookside restaurant, not because he wanted to keep Sutera in his sight, but rather because he wanted to get the phone number from the address book. In short, Sutera was not deprived of his freedom in any significant way.

### C. *Sutera's Conviction for Money Laundering*

■ Sutera challenges his conviction for money laundering claiming there was insufficient evidence to convict him of this crime. Because this is an appeal from a jury verdict, we view the evidence in the light most favorable to the government. We may overturn the jury's verdict only if we conclude that the evidence is such that a reasonable-minded jury must have entertained a reasonable doubt as to the government's proof of one of the essential elements of the offense. *See United States v. Noibi*, 780 F.2d 1419, 1421 (8th Cir.1986).

The three money laundering charges, as pointed out in subpart A of this opinion, were based on Sutera's deposit of three checks into an account in the name of "Sutera's Old San Francisco Restaurant." At trial, Vince Costello, the man who wrote the checks, testified that he gave the checks to Sutera to cover his gambling losses. Sutera then deposited these checks into the restaurant account at Boatmen's bank.

The Suteras had set up the account in 1976 so they would have a place from which they could obtain change for the restaurant. None of the restaurant's receipts or bills were ever run through this account. In fact, the account was never used by the restaurant for any purpose. However, between October, 1987 and December, 1988, James Sutera deposited over $57,000 in cash into the account. Testimony at trial established that Sutera paid his personal bills and some gambling related expenses, including fees for line information, out of this account. Checks drawn on the account only bore the name of the restaurant.

Sutera raises two objections to his conviction for money laundering. He first argues that Costello's testimony failed to establish that the checks represented the proceeds of bookmaking activity. We have carefully reviewed the trial transcripts and we disagree. While Costello's testimony was somewhat equivocal, his statements about the nature of the checks, combined with Agent King's testimony about Sutera's bookmaking records, provides sufficient evidence for the jury's verdict.

■ Sutera also contends that the government failed to prove that he had the requisite intent to launder money. The jury was properly told that it had to find that Sutera "knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds." Jury Instruction No. CC, Appendix for Appellant at 58. Sutera deposited Costello's checks into this account. He also paid personal and gambling related expenses out of this account. Sutera argues that he is innocent because he did not hide the money in a traditional "laundering" manner. While the money might have been better hidden if it had been mixed with restaurant receipts, the money laundering statute does not require the jury to find that Sutera did a good job of laundering the proceeds. The jury simply has to find that Sutera intended to hide the gambling proceeds. Because of the nature of the transactions run through this account and the fact that it was a business rather than a personal account, we conclude that a reasonable jury could find that Sutera had the requisite intent to launder money.

### D. *Enhancement of Sutera's Offense Levels Under the Sentencing Guidelines*

■ Sutera's final argument is that the enhancement of his sentences for operating an illegal gambling operation and for using

interstate wire facilities to promote a gambling operation was improper. The sentencing court enhanced Sutera's offense level for the gambling charge by three points because it concluded that he was a manager or supervisor in Searing's gambling operation. *See* U.S.S.G. Manual § 3B1.1(b) (Nov. 1, 1990); *see also* Reporter's Transcript of August 16, 1990, at 78–79. Sutera's offense level was also increased for the improper use of interstate wire facilities by four points. In this instance, the court found that Sutera was the leader of the criminal activity because it pertained to his own bookmaking operation rather than Searing's operation. *See* U.S.S.G. § 3B1.1(a); *see also* Reporter's Transcript of August 16, 1990, at 79–80. Reviews of factual determinations relating to section 3B1.1 of the Sentencing Guidelines are guided by the clearly erroneous standard. *See* 18 U.S.C. § 3742(e)(4) (1988); *United States v. Olesen*, 920 F.2d 538, 543 (8th Cir.1990).

Defendant argues that the enhancement was improper because there was no evidence to support the existence of five participants in the enterprise and because illegal use of interstate wire facilities is a solitary crime that did not involve supervision or leadership of others. We disagree with Sutera's contention and affirm his sentence under the guidelines.

■ There is sufficient evidence in the record to support the conclusion that Sutera supervised five or more persons in his gambling business. *See* U.S.S.G. § 3B1.1(b). Anthony Ferrara accepted bets from others and passed them on to Sutera in return for a percentage of the action. Reporter's Trial Transcript at 919. Lawrence Graham, John Roberts, and Paul Flynn also accepted wagers for others and turned those bets over to Sutera. *Id.* at 357, 391, 609. Testimony at trial also indicated that several bartenders passed out line sheets, collected money, and paid off bettors for Sutera at the Brookside restaurant. *See id.* at 752–755, 619, 625. The Supreme Court has recognized that all of these participants would be liable under section 1955. *See Sanabria v. United States*, 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 2182 n. 26, 57 L.Ed.2d 43 (1978) ("Numerous cases have recognized that 18 U.S.C. § 1955 … proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor.") We conclude that the district court's finding that Sutera supervised or led five or more participants in the Searing gambling enterprise was not clearly erroneous.

■ Sutera's second argument is also without merit. Sutera correctly notes that section 3B1.1 permits enhancement only for defendant's leadership role in the offense of conviction. A leadership role in collateral conduct will not support enhancement. *See United States v. Streeter*, 907 F.2d 781, 792 n. 4 (8th Cir.1990). But the court may consider the defendant's leadership role over acts either that were a part of the crime of conviction or that furthered that crime. *See* U.S.S.G. Manual § 1B1.3(a)(1). An individual's use of interstate wire facilities to obtain gambling information is not a crime unless that person is "engaged in the business of betting or wagering." 18 U.S.C. § 1084(a) (1988). Running a gambling business is a fundamental aspect of this statute. Sutera's leadership role in that business served as an appropriate basis for the court's decision to enhance his sentence. Sutera's offense was not limited to making several interstate phone calls to obtain betting information or to accept wagers. The district court correctly concluded that Sutera had used interstate wire facilities to obtain wagering information for his *own* betting operation. Such a finding clearly supports a four point enhancement of the defendant's offense level.

### E. Conclusion

Sutera's claims on appeal are meritless. The amendment of the money laundering charge was acceptable. Sutera's rights were not violated when he was interviewed at his home. There was adequate evidence in the record to support Sutera's conviction for money laundering. Finally, the enhancement of Sutera's sentence was appropriate considering his role in the gambling

enterprise. For the foregoing reasons, the decision of the district court is

AFFIRMED.