649 A.2d 103

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. MICHAEL S. KEATING, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 25, 1994—Decided November 15, 1994.

---

[5] We express no view regarding the obligation of a municipal land use agency to consider the policies of the Right to Farm Act in performing its statutory responsibilities such as reviewing variance applications.

Before Judges BRODY, LONG and LEVY.

*Sandra M. Iammatteo,* Deputy Attorney General, argued the cause for appellant (*Deborah T. Poritz,* Attorney General, attor-

ney; *Michael Bozza*, Assistant Attorney General, of counsel and on the brief; *Ms. Iammatteo*, on the brief).

*M.W. Pinsky* argued the cause for respondent.

The opinion of the court was delivered by

BRODY, P.J.A.D.

The crimes with which defendant is charged in a multi-count indictment include bribery and misconduct in office. He is the Clerk of Camden County. The matter is before us to review an interlocutory order suppressing a ten-minute audiotape recording of two state police investigators questioning defendant in the living room of his home. Defendant did not know that the questioning was being taped. Five state investigators had just completed a two-hour warranted search of the house. The trial judge concluded from his findings that the questioning was custodial and therefore defendant's answers were inadmissible because he had not been warned fully of his *Miranda* rights.[1] We do not disagree with the judge's findings. But the relevant findings point to only one possible conclusion: the questioning was not custodial. We therefore must reverse.

The investigators arrived at defendant's home on a Saturday morning at 10:30, shortly after a visitor had left. The visitor was George Nicholas, who was co-operating in the police investigation. In the course of his visit Nicholas gave defendant $5,000. Nicholas wore a hidden tape recorder on his person that, it is suggested, recorded evidence that the payment was a bribe. The audiotape that defendant seeks to suppress contains his statement to the police that he received the $5,000 as a political campaign contribution.

---

[1] As will be seen, before the questioning began investigators had advised defendant of his rights but failed to tell him that the answers he gave may be used as evidence against him at trial. The State concedes that the *Miranda* warnings therefore were not fully given.

 "*Miranda* does not apply to noncustodial interrogations." *State v. Zucconi*, 50 *N.J.* 361, 363, 235 *A.*2d 193 (1967). An interrogation is noncustodial unless the suspect believes and has "reason to believe that he has been deprived of his. freedom." *State v. Lacaillade*, 266 *N.J.Super.* 522, 527, 630 *A.*2d 328 (App. Div.1993) (*Miranda* warnings not required where police officer, knowing he was a suspect, was questioned without the threat of restraint at police headquarters where he worked). In finding that the brief questioning here was custodial the trial judge confused an intrusion on defendant's privacy, the hallmark of a search, with whether defendant reasonably perceived that he was deprived of his freedom, the hallmark of being in police custody. The confusion may have occurred because as defendant freely moved about the house an investigator kept him under observation to be sure that he would not remove or destroy evidence. The fact that an investigator kept tabs on defendant as he performed domestic chores, took a shower and changed his clothes did not give him reason to believe he was in police custody.

 Denial of a similar motion to suppress was affirmed in *United States v. Sutera*, 933 *F.*2d 641 (8th Cir.1991). Police officers there questioned the defendant in his bedroom for an hour while they spent three and one-half hours executing a warrant to search his apartment and his car. The court described the circumstances of the search as follows:

> On December 11, 1990, Agent King, Agent Burns, and four other law enforcement officers went to Sutera's apartment to execute a search warrant for the residence, Sutera's automobile, and the actual persons of Sutera and Richard Turner. After searching Sutera, the officers asked him if he was willing to talk to them about his gambling business. Sutera was informed that he was not under arrest, that he did not have to answer questions, and that he could leave at any time. Sutera indicated that he was willing to talk to the officers.

> The officers conducted the interview in the bedroom because there were only three rooms in the apartment, and Richard Turner, a potential codefendant, was in the kitchen. The door to the bedroom remained open throughout the interview. Sutera was free to move about the apartment during the execution of the search warrants and the interview, with the limitation that he not interfere with the officers' search or answer the telephone.

[*Id.* at 646–47.]

Here, the trial judge's findings are similar to those in *Sutera,* and they do not support his conclusion that defendant reasonably believed he was in custody. The judge found that when the investigators first arrived at defendant's home, they advised him that "he was not under arrest at that time, nor would he be arrested that day." In fact defendant was not arrested before being indicted eight months later.

The judge expressly found that Investigator Alan Beck was "a credible witness." Most of the time it was Beck who followed defendant around the house. Beck had retired from law enforcement before testifying at the *Miranda* hearing. Deputy Chief Tom Boney was in charge of the search operation and he was one of the two investigators whose questioning is captured on the suppressed tape. Investigator Beck testified as follows as to what Boney told defendant when the investigators first arrived:

At that point Mr. Boney was explaining to Mr. Keating why we were there, to execute a search warrant. He explained that Mr. Keating wasn't under arrest. That he wasn't going to be arrested that day. He explained that he could have an attorney present. He could use the phone to call an attorney. He could leave to get an attorney.

On cross-examination by defendant's counsel Beck was again asked what he recalled Boney's telling defendant when the investigators arrived:

Q ... I want you to think real hard. Give me an accurate statement, if you can.

A Okay. We walked in the room, Mr. Boney said, after we identified ourselves, et cetera, he was having a conversation, I came back in, he said—As a matter of fact, I believe he called him Mike, he said, Mike, I'm from the Division of Criminal Justice, you're not being arrested today. You're free to go. You're free to talk to an attorney. You can call an attorney. I believe those are the warnings I heard.

The trial judge found:

Deputy Chief Investigator Boney, the Court finds, advised the defendant that he was in charge of the search warrant execution of his house and that the defendant would not be arrested. The Court finds that Boney further advised Keating he could call and have an attorney there. That Boney further told the defendant he could leave to get an attorney, and that he didn't have to talk to us.

The judge also was at least skeptical respecting defendant's testimony that he was overcome by fear during the questioning:

> I find that the defendant's testimony that he suffered fear and terror emotionally to be somewhat inconsistent with his other testimony that he had no fear of the officers, since he had done nothing wrong.

The judge noted that the questioning of defendant was "basically calm and cordial, although very serious and very much to the point." He added that the questioning did not occur in the intimidating setting of a police headquarters:

> The Court further considers the fact that the defendant was in his very home at this time as opposed to being in a police atmosphere, such as a station house or a police vehicle.

The *Sutera* court made the same point: "While a person may be deemed to be in custody even in his own home, it is not the type of coercive setting normally associated with custodial interrogation." *Sutera, supra,* at 647.

The trial judge also found that during the search defendant telephoned his dry cleaner to find out when it closed that day. Upon being told that it closed at 1:00 p.m., defendant so advised the investigators and they assured him that they would be done in time for him to pick up his tuxedo there so he could wear it at a dinner he was scheduled to attend that evening.

These findings, which are supported by the evidence, should have led the judge to conclude that the interrogation was not custodial. However, he came to the contrary conclusion on the basis of other findings that do not bear on the issue of whether defendant reasonably believed that he had been deprived of his freedom during the questioning.

The judge's other findings are as follows: Deputy Chief Boney "controlled the events at the location that day." "Boney's intent was to get the defendant to incriminate himself and others...." The State had probable cause to arrest defendant. George Nicholas was working for the State, and defendant was a target of the investigation. Defendant knew that the investigators had seized from his home the $5,000 that Nicholas had given him earlier that morning and knew that Nicholas would be a witness against him. The investigators told defendant that the charges against him were serious and that "he could get prison time." The police

presence "overall was longer" than the brief questioning captured on the suppressed tape. Except for the police, defendant was alone in his home during the search and questioning. The "subjective intent of the questioning and the investigation was admittedly to obtain incriminating evidence against the defendant." "[A]ny interview of one suspected of crime by the police will have coercive aspects to it."

The judge concluded his oral opinion by summing up the facts that led him to suppress the tape:

> This Court finds that the total tone of the questions, the duration of the police presence, the fact that the police totally controlled the atmosphere, that they had immediate control over the defendant, they had probable cause to arrest him for a number of offenses that morning, that the questions were put to a target person with the intent to obtain, obtain incriminating evidence against him, that the defendant knew or should have known that he had serious legal problems at that time and that he was the target; these facts as well as the other circumstances present would lead, in my opinion, a reasonable person under similar circumstances to believe that they were deprived of their freedom in a significant way during the time that the police were present.

> &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

> Therefore, I find the defendant was in custody.

The presence of five police officers searching at will through one's home may reasonably engender fear, helplessness, frustration and anger. It does not follow, however, that the subject of such a search reasonably felt himself physically restrained or threatened with restraint. The police directed their "control" at preserving the integrity of the search, not at keeping defendant from going where he pleased. The situation is somewhat unusual because the questioning occurred in the suspect's own home where he may have wished to stay. The judge did not find, however, that the police denied defendant the freedom to leave or to stop the questioning at any time. On the contrary, as previously noted the judge found that the police were cordial to defendant and advised him that he was not under arrest, would not be placed under arrest that day, could leave, could call his attorney and did not have to answer their questions.

■ The trial judge also based his determination on the fact that when defendant was being questioned, the police had already focused on him as a target of the investigation and were trying to obtain evidence that could be used against him. What the police had in mind, however, is not the issue; the issue is whether defendant reasonably believed that he was in custody when being questioned. *Stansbury v. California*, 511 *U.S.* ——, 114 *S.Ct.* 1526, 128 *L.Ed.*2d 293 (1994); *State v. Graves*, 60 *N.J.* 441, 449–50, 291 *A.*2d 2 (1972).

We turn finally to a finding that defendant argues supports the judge's conclusion that the questioning was custodial. Before beginning the questioning, Boney indicated that the search was over and he would like to clear up a few things before leaving. A transcript of the beginning of the questioning as recorded on the tape is as follows:

TB: We're just about finished up, um, you can see we didn't toss your house.

MK: I, I know, I appreciate that.

TB: You got no complaints?

MK: No, no, not at all.

TB: Right, the, ah, you understand, you're not under arrest, we're not gonna arrest you.

MK: Uh-uh.

TB: Right, we're basically gonna clear up a few ends as best we can and get out of here and you can go do your thing ...

MK: Okay.

The judge found that Boney's remarks "evidences the state of mind of the speaker being completely in control of the scene." We already stated that Boney's state of mind is not the issue. If the judge meant that defendant reasonably understood that Boney was threatening to arrest or detain him unless he answered a few questions, one cannot reasonably draw that inference from Boney's remarks. There was nothing in the evidence to suggest that Boney could not be taken at his word when he repeatedly assured defendant that he was not in danger of being arrested.

The order suppressing the audiotape is reversed and the matter remanded for further proceedings.