# Supreme Court of Louisiana

The Opinions handed down on the **3rd day of May, 2017**, are as follows:

**PER CURIAM(S)**:

2015-K-1120        STATE OF LOUISIANA v. MARTIN G. LEMOINE (Parish of Pointe Coupee)

Judge James T. Genovese, assigned as Justice ad hoc, sitting for Knoll, J. for oral argument.  He now sits as an elected Justice at the time this opinion is rendered.

For the foregoing reasons, jurors rationally found that defendant knowingly gave, transferred, maintained an interest in, and/or otherwise made available things of value which he knew to be for the purpose of committing or furthering the commission of the criminal overbilling scheme.  We therefore reverse and vacate the First Circuit's ruling and remand to that court for consideration of the two remaining grounds in defendant's motion for post-judgment verdict of acquittal.
REVERSED AND REMANDED.

CRICHTON, J., dissents and assigns reasons.
GENOVESE, J., dissents for the reasons assigned by J. Crichton.

## SUPREME COURT OF LOUISIANA

### No. 2015-K-1120

### STATE OF LOUISIANA

### VERSUS

### MARTIN G. LEMOINE

### ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FIRST CIRCUIT, PARISH OF POINTE COUPEE

**Per Curiam** *

We granted writs to examine whether the court of appeal correctly found the evidence insufficient to support the jury's determination that defendant committed money laundering pursuant to R.S. 14:230(B)(2), in conjunction with his scheme to fraudulently overbill Union Pacific Railroad (hereinafter "Union Pacific") for diesel fuel. We find that the jury rationally concluded that defendant knowingly gave, transferred, maintained an interest in, and/or otherwise made available things of value which he knew to be for the purpose of committing or furthering the commission of the criminal overbilling scheme. We therefore vacate the First Circuit's ruling and remand to the court of appeal for consideration of the two remaining grounds in the motion for post-judgment verdict of acquittal.[1]

After the trial in this matter, jurors returned a unanimous verdict finding defendant guilty as charged of money laundering, pursuant to R.S. 14:230(B)(2), in the amount of $20,001. Defendant filed a motion for post-verdict judgment of acquittal, contending the evidence was insufficient to support the verdict because:

---

* Judge James T. Genovese, assigned as Justice ad hoc, sitting for Knoll, J. for oral argument. He now sits as an elected Justice at the time this opinion is rendered.

[1] As the First Circuit framed the scope of its decision: "We agree with the defendant regarding the second issue. The evidence as a matter of law was insufficient to convict because the State failed to prove every element of the offense. Specifically, the State failed to prove the defendant knowingly acted in a way for the purpose of committing or furthering the commission of any criminal activity. Because the foregoing analysis disposes of the sufficiency issue in its entirety, we do not address the other arguments raised by the defendant." *Lemoine*, 14-1158, p. 11, 174 So.3d at 38.

1

(1) the state failed to prove that any fraudulent invoices were sent to Union Pacific during the 46-day period charged; (2) the state failed to prove that defendant acted for the purpose of committing or furthering the commission of any criminal activity; and (3), in the alternative, the state had only proven misdemeanor grade money laundering because the "things of value" were checks, rather than cash. The trial court granted the motion on all three grounds, after which a divided First Circuit panel affirmed. *State v. Lemoine*, 14-1158 (La. App. 1 Cir. 5/6/15), 174 So.3d 31 (Welch, J., dissenting with reasons).

A motion for post-verdict judgment of acquittal shall be granted only if the evidence viewed in a light most favorable to the state does not reasonably permit a finding of guilt. La.C.Cr.P. art. 821(B). A comment to Art. 821 clarifies that the test to be applied in ruling on such a motion is "whether a reasonable fact finder must have a reasonable doubt" under the well-settled standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The section of the money laundering statute under which defendant was found guilty, R.S. 14:230(B)(2), makes it unlawful to knowingly: "Give, sell, transfer, trade, invest, conceal, transport, maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity."[2] The issue before us is whether, viewing the evidence in the light most favorable to the prosecution, any rational fact-finder could have found these essential elements proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

---

[2] The Louisiana money laundering law prohibits transactions involving the proceeds of criminal activity. During the 46-day period charged, from January 20, 1998 to March 6, 1998, the definition of "funds" had been construed as not including checks. Because Union Pacific paid defendant for the inflated invoices by issuing checks, the state prosecuted him under Section (B)(2), under the theory that those checks were nonetheless things of value. Notably, in response to the jurisprudence finding checks not "funds" (nor by extension "proceeds") for purposes of R.S. 14:230, *see State v. Odom*, 07-0516 (La. App. 1 Cir. 7/31/08), 993 So.2d 662, the legislature expanded the definition of funds to include electronic and written checks, Section (A)(2)(d), and investment securities and negotiable instruments, Section (A)(2)(e). *See* 2010 La. Acts. 608.

2

The evidence at trial showed that defendant, as president of Morel G. Lemoine Distributors, Inc. ("Morel"), concocted and executed a scheme by which he routinely defrauded Union Pacific by billing the railroad for more fuel than was dispensed to it. Union Pacific's payments of the inflated invoices came in the form of checks which were deposited into Morel's business checking account.[3] This scheme flourished during 1995, 1996, and 1997, until Morel's lead driver, Keith Glaser, who had been a key figure in inflating the fuel sales at defendant's direction, left employment at Morel. Thereafter, the scheme was adjusted to further obscure the overbilling[4] and, later, to overcome checks and balances Union Pacific put in place; yet continued nonetheless at defendant's direction and through the efforts of his wife, Veronica Lemoine (who scratched out fuel totals on manifests), and Morel's truck dispatcher, Rex Averill (who inflated invoices sent to Union Pacific to add "phantom gallons" not dispensed). Though the scheme ultimately ceased by March 6, 1998, when Union Pacific's own fueling facility became operational, the illegal activity did not come to light until 2002, when Averill was terminated by Morel, hired by Union Pacific, and disclosed the scheme's existence to its long-standing target.

In affirming the trial court's post-verdict judgment of acquittal, the First Circuit noted the dearth of jurisprudence interpreting the money laundering statute[5]

---

[3] The evidence also showed that defendant directed his employees to dispose of excess fuel inventory (that is, the gallons that Union Pacific paid for but never received) by making discounted off-the-books cash sales to farmers.

[4] At some point, Morel's drivers ceased handwriting the gallons of fuel dispensed on their manifests so that it was no longer necessary to scratch out the discrepancies. Morel also ceased using field tickets and instead drivers kept track of gallons dispensed on scrap paper, which were discarded after the inflated invoices were generated.

[5] Aside from this case, there are only two appellate decisions addressing R.S. 14:230. The case of *State v. Dudley*, 06-1087 (La. App. 1 Cir. 9/19/07), 984 So.2d 11 involved laundering by concealment and is therefore inapposite here; in *State v. Odom*, *supra*, the First Circuit considered whether checks amounted to "proceeds" as envisioned in R.S. 14:230 subsections *other than (B)(2)*. Notably, the First Circuit in *Odom* took the opposite view of the similarities (or lack thereof) between the state and federal money laundering laws, observing in part:

and, having perceived similarities between R.S. 14:230 and the federal money laundering law, *see* 18 U.S.C.A. § 1956, the First Circuit majority analogized to federal money laundering jurisprudence[6] before ultimately concluding that the trial court correctly granted an acquittal. *See Lemoine*, 14-1158, pp. 11, 13–25, 174 So.3d at 38–47.

The First Circuit majority erred to the extent it conflated the federal law and related jurisprudence with the Louisiana statute at issue. The Louisiana legislature has designated money laundering as a crime of "general intent."[7] In contrast, the federal money laundering statute exacts a higher burden of proof by requiring that a transaction was conducted with *specific intent* to promote the carrying on of

---

> We reject the argument that the federal statute offers guidance to determine the issue presented. . . . Our state statute is obviously not as broad as the federal statute. [And because] the federal statute predates the enactment of this state's statute in 1994, [] if the legislature had intended to include the more expansive definitions, it could have done so. A criminal statute must be given a genuine construction consistent with the plain meaning of the language in light of its context and with reference to the purpose of the provision. La. R.S. 14:3.

*Odom*, 07-0516, p. 11, 993 So.2d at 671. Thus, in contrast with the First Circuit majority here, the court in *Odom* adopted a view more compatible with our view and with Judge Welch's dissent here, emphasizing the substantial differences between the state and federal laws. *Cf. Lemoine*, 14-1158, p. 12, 174 So.3d at 55 ("Essentially, the majority reasons that La. R.S. 14:230(B)(2) is similar to 18 USCA 1956 A(a)A(i); therefore, we should look to federal jurisprudence to get the proper [perspective] on Louisiana Law, although it concedes that the statutes differs on the intent element, *i.e.*, state law requires general intent whereas federal law required specific intent. However, we do not need to resolve this case by resorting to federal jurisprudence, but rather, by evaluating the language of the statute itself and its legislative intent.") (Welch, J., dissenting).

[6] In particular, the First Circuit majority equated the requirement of Section (B)(2) that a defendant engage in an enumerated act with something of value "for the purpose of committing or furthering the commission of any criminal act" with the federal prohibition against using criminal proceeds "with the intent to promote the carrying on of specified unlawful activity," (*see* § 1956(a)(1)(A)(i)), which is known as the "promotion" method of money laundering (as opposed to the "concealment" method as provided in § 1956(a)(1)(B)(i))).

[7] The Louisiana legislature has declared that, "in the absence of qualifying provisions, the terms 'intent' and 'intentional' have reference to 'general criminal intent.'" R.S. 14:11. Because the statute here bears no qualifiers, but rather makes it unlawful to "knowingly" do any of the enumerated acts, defendant was prosecuted for and found guilty of a general intent crime. *Cf. State v. Bernard*, 441 So.2d 817, 820 (La. App. 3 Cir. 12/14/83) ("In spite of the words that 'it shall be unlawful for any person knowingly or intentionally ...' to do the prohibited acts, the statute requires no more than general criminal intent. A distribution offense is a crime requiring only general criminal intent. Such intent is established by mere proof of voluntary distribution.") (citing R.S. 14:11 and *State v. Banks*, 307 So.2d 594 (La. 1975), *writ denied*, 445 So.2d 439 (La. 1984)).

4

unlawful activity.[8] In this regard, as Judge Welch's dissent observed, the majority overstated any similarities between the state and federal provisions. *See Lemoine*, 14-1158, pp. 4–5, 174 So.3d at 51 (Welch, J., dissenting).

The First Circuit majority further blurred the lines between the state and federal statutes, and their various subsections, when it imported a requirement that the state must prove that the defendant here specifically sought to conceal his ill-gotten gains. Though concealment is among the several prohibited acts listed in Section (B)(2), it is but one way in which this particular method of money laundering may be committed. The act of concealing proceeds of criminal activity is also found within other subsections of the Louisiana statute and is likewise a separate means of establishing money laundering under federal law. *See* R.S. 14:230(B)(1) and (B)(5); 18 U.S.C. § 1956(a)(1)(B)(i).

We are also unpersuaded by the First Circuit majority's view that the Louisiana money laundering statute is susceptible to the "merger problem;" a concept according to which a statute is drafted in such a way that the evidence necessary to prove the underlying or primary crime (here, theft from Union Pacific) is sufficient to also prove a more serious secondary offense (here, money laundering). Evidence of defendant's fraudulent billing alone, *i.e.*, the thefts for which he was not prosecuted, could not, without more, serve as a basis for a money laundering prosecution. Rather, Section (B)(2) of the money laundering statute applies here because the evidence shows, not only that defendant repeatedly stole from Union Pacific, but that he was depositing those ill-gotten gains into his business account, in which he maintained an interest and from which he routinely transferred money to perpetuate and further his business operations, which

---

[8] *See* 18 U.S.C. § 1956(a)(1)(A)(i) ("Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity [shall be punished for money laundering].").

5

functions involved the recurring thefts. Put another way, this is not a "garden variety" theft case, as defendant asks us to find, but rather, in light of the use of stolen money to finance future thefts, a prototypical money laundering case.

Moreover, related concerns that Section (B)(2) is open-ended, because it applies to "anything of value," overlook the purpose of the money laundering statute, which is not to enable prosecutors to latch onto most any crime and, on a whim, elevate the charges to the offense of money laundering, but rather as the statute's title announces, to prohibit "transactions involving proceeds of criminal activity." *See* R.S. 14:230.[9] For this reason, defendant was subject to prosecution for and ultimately found guilty of the more serious offense of money laundering.[10] *See Lemoine*, 14-1158, pp. 7–8, 174 So.3d at 52–53 (Welch, J., dissenting) ("It sets a dangerous precedent to judicially legislate in accordance with federal law and federal jurisprudence without attempting to ascertain the *Louisiana legislative intent*. . . . The clear legislative intent was to prohibit transactions involving the proceeds of criminal activity.").

Setting aside issues of interpretation, we turn now to the sufficiency of the evidence and conclude that the First Circuit and trial court erred in finding that the state failed to prove defendant acted for the purpose of committing or furthering the commission of any criminal activity.

---

[9] Notably, though the title of an act is not a part of the statute, it can be used to resolve doubt as to legislative intent as to a specific provision. *See, e.g., State v. Williams*, 10-1514, p. 7 (La. 3/15/11), 60 So.3d 1189, 1192; *Authement v. Shappert Engineering*, 02-1631, p. 8 (La. 2003), 840 So.2d 1181, 1186 (title of an act "may be instructive in determining legislative intent"); *State v. Madere*, 352 So.2d 666, 668 (La. 1977) (same); *see also Schimpf v. Thomas*, 204 La. 541, 559, 15 So.2d 880, 886 (1943) ("A title is no part of a statute, but it may be considered in determining the legislative intent where doubt exists."). Here, simply revisiting the statute's title settles any doubt generated by use of the phrase "anything of value" to describe thing(s) being laundered in a Section (B)(2) case. *Cf. Williams*, 10-1514, p. 8, 60 So.3d at 1193.

[10] Under the law at the time of the instant offense, defendant would have faced up to 10 years imprisonment (with or without hard labor) for theft of $500 or more, plus a fine of up to $3,000. Under R.S. 14:230(E)(3), however, based the evidence that he laundered at least $20,000 (but less than $100,000), defendant faced a sentence of between two and 20 years imprisonment at hard labor, plus a fine of up to $20,000.

First, the state was not required to prove that any *actual* tainted or "dirty"[11] dollars were used during the charged period. Defendant contends that "because money is fungible and the checks from the railroad commingled [with] legitimate payments," the state was required to show that "the 'dirty' portion of the money was necessarily used for the criminal purpose." In defendant's appreciation, this Court should adopt what he sees as the preferred approach when funds have been commingled in a money laundering case, which is to require proof that the expenditures from the commingled account exceeded the amount of clean money therein. In advocating for this approach, he points to a case from the Federal Fifth Circuit in which that standard was applied. *See United States v. Loe*, 248 F.3d 449, 466–67 (5th Cir. 2001).[12]

After careful consideration, we find that the Louisiana money laundering law places no such burden on the state to trace dirty money after it has been commingled with clean money. Money launderers often mix the fruit of their crimes with legitimately-acquired assets, assuming detection of the dirty funds will be more difficult as a result. Mindful of this reality, courts have found that commingling can itself be evidence of money laundering[13] and have found that the purpose of money laundering statutes indicates direct tracing is not required. *See, e.g., United States v. Ward*, 197 F.3d 1076, 1082–83 (11th Cir. 2000) (requiring

---

[11] As used in the court below, the ill-gotten or tainted money at issue in a money laundering case is often referred to colloquially as "dirty" money. We use this term here in keeping with legal nomenclature. *See Lemoine*, 14-1158, p. 23, 174 So.3d at 46 (citing federal law); *see also, e.g., United States v. Santos*, 553 U.S. 507, 536, 128 S.Ct. 2020, 2038, 170 L.Ed.2d 912 (2008); *People v. Gutman*, 959 N.E.2d 621, 632 (Ill. 2011).

[12] As discussed below, *see* n.14, the case of *Loe* was not a money laundering case under the same statute the First Circuit majority found analogous here, 18 U.S.C. § 1956, but rather a prosecution for engaging in illegal transactions brought under the distinct provisions of § 1957, which have been distinguished and treated differently as to the prosecution's burden of proof.

[13] *See, e.g., United States v. Phythian*, 529 F.3d 807, 813 (8th Cir. 2008) ("Where a defendant commingles illegal proceeds with the identity or the funds of a legitimate and usually preexisting business . . . [s]uch commingling effectively conceals the nature, source, ownership, and/or control of the unlawful proceeds") (citation and quotation marks omitted); *United States v. Sutera*, 933 F.2d 641, 648 (8th Cir. 1991) (tainted funds "might have been better hidden if [they] had been mixed with [legitimate] receipts").

7

prosecution to "trace the origins of the funds and ascertain 'exactly which funds were used for what transaction'" is unnecessary and contrary to congressional intent).[14] We agree that requiring the state to trace dirty money once it has been commingled would be inconsistent with the legislative intent of the money laundering law and would serve only to incentivize criminals' efforts to obscure ill-gotten gains. Thus, at least in a money laundering case, the law only requires the state to prove that dirty money constituted a portion of the commingled funds that were maintained or deployed for a criminal purpose.[15] Accordingly, even accepting that the evidence in this case showed the dirty money made up less than six percent of the balance of defendant's business account, the state carried its burden of proof in this regard.

---

[14] We note that 18 U.S.C. § 1956 money laundering prosecutions and § 1957 prohibited monetary transaction prosecutions have been treated differently with regard to the government's burden of proof regarding commingling. While there is consensus that § 1956 cases do not require the prosecution to trace dirty funds, there has been disagreement in § 1957 cases. *See United States v. Rutgard*, 116 F.3d 1270, 1292 (9th Cir. 1997) ("[The fungibility of money destroys the specific identity of any particular dollar and makes commingling an obvious way to hide criminal funds.] If § 1956 required tracing of specific funds, it could be wholly frustrated by commingling. . . . Neither the same reasoning nor the same language is present in § 1957."). In any event, a majority of circuits has found that the government is not required to trace criminally-derived funds once they have been put into commingled accounts. For an expanded discussion, *see* Joseph R. Miller, *Federal Money Laundering Crimes—Should Direct Tracing of Funds Be Required?*, 90 Ky. L.J. 441, 449 (2002).

[15] *See United States v. Nickson*, 127 Fed. Appx. 770, 773 (6th Cir. 2005) ("[T]he government need not trace funds garnered illegally to their use in a money-laundering scheme on a dollar-for-dollar basis on the theory that money-launderers would be permitted to evade sanctions by commingling illegal assets with legitimate earnings."); *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) ("The presence of legitimate funds made the transactions no more lawful because the transactions still involved the illegitimate proceeds."); *United States v. Baker*, 227 F.3d 955, 965–66 (7th Cir. 2000) (government's evidence need not isolate income from prostitution from income from legitimate massage services when money from both was commingled in one account); *United States v. Tencer*, 107 F.3d 1120, 1131 (5th Cir. 1997) (government must only show that part of the money in the account represented ill-gotten proceeds); *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991) ("[W]e cannot believe that Congress intended that participants in unlawful activities could prevent their own convictions under the money laundering statute simply by commingling funds derived from both "specified unlawful activities" and other activities. Indeed, the commingling in this case is itself suggestive of a design to hide the source of ill-gotten gains."); *United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994) (rejecting argument that the government must trace funds to specific drug sales to prove money laundering: "Like the Seventh Circuit, we refuse to read the statute in a manner that would reward the more creative money-launderer by allowing him to escape liability altogether by commingling assets or otherwise disguising the source of his funds.").

In addition, the state was required to show that defendant took a prohibited action with the account with a known purpose of committing or furthering the commission of criminal activity. The First Circuit majority conceded the illegality of defendant's actions before the charged period because the evidence showed that defendant paid Keith Glaser to routinely inflate the fuel tickets. But, because the majority could find no evidence that anything illegal was done with money from the account during the charged timeframe, it found the state failed to prove its case. It was material in the First Circuit's view that while Glaser had been paid extra to manipulate fuel tickets, Averill only received regular wages; and because Averill, but not Glaser, was employed during the charged period, defendant had made no illegitimate use of the money during the critical time.

We find this conclusion in error in light of the evidence, which jurors were entitled to credit, that Averill played a pivotal role in the scheme, *at defendant's direction*, both before and during the charged period. It is immaterial that Averill's wages did not include "extra" pay to further the scheme because nothing in Section (B)(2) justifies drawing such a distinction. To the contrary, though Averill was not paid extra to inflate the numbers, testimony showed that during the 46 days at issue he was paid on a weekly basis in exchange for performing the duties of his employment—*which included the continued overbilling of Union Pacific. See Lemoine*, 14-1158, p. 9, 174 So.3d at 53–54 (Welch, J., dissenting) ("Averill['s] continued employment required that he continue his participation in the over billing scheme. He was being paid with some portion of the illegally billed money by the corporation in order to continue the illegal overbilling scheme. No doubt this was true, because when he was fired in 2002, he reported the scheme.").

More broadly, defendant's assertion that the account was used only for legitimate business purposes rings hollow in a case in which the evidence showed that his business was routinely committing theft and thereby operating as a

9

criminal enterprise. It appears plain that when an enterprise engages in crime, its operating expenses may be reasonably be characterized as illegitimate, *i.e.*, for the known purpose of furthering the criminal activity.

Loretta Robillard, whom defendant employed as a bookkeeper from 1995–2010, including during the charged period, testified that she deposited checks from Union Pacific into defendant's checking account at Guaranty Bank, generated invoices based on the sales numbers Averill logged, and that money in the account was used to pay the bills and expenses of running the business. She also testified that she shared invoicing duties with Averill. Averill testified that he worked as a truck dispatcher for Morel from 1995 until he was terminated in 2002. He explained that his duties included a variety of tasks, ranging from managerial to janitorial, and that he did "all the things that [defendant] didn't wanna do," to keep operations going. Averill facilitated the scheme by including "phantom gallons" on invoices prepared for Union Pacific and Averill's testimony verified that defendant knew as much. As part of his work duties, Averill also kept an overage report—*for defendant and with defendant's knowledge*—tracking the number of phantom gallons for which Union Pacific was being fraudulently billed. Defendant came to Averill routinely to see "where [they stood] on the overage report," that is, to gauge how many gallons they had overbilled.[16] Averill confirmed that the scheme was ongoing during the charged period, at defendant's direction, and that Averill personally generated and sent inflated invoices during that time, and further, that checks from Union Pacific paying inflated invoices were received during that time. Averill's description of the scheme was corroborated by Union Pacific Special

---

[16] Averill also explained the means by which defendant directed him to reduce the excess fuel inventories that accumulated as a result of Union Pacific not being given all of the gallons they bought. According to this aspect of the scheme, Averill periodically contacted local farmers and sold them the excess fuel for cash at a rate of just "a penny a gallon, a penny above cost." The cash proceeds of these sales went to defendant.

Agent Stephen Paddy, who presented examples of inflated invoices received and paid by Union Pacific.

Jurors were entitled to credit this testimony, and to conclude based thereon that defendant was guilty of laundering money during the charged period. Jurors were similarly justified in finding, based on the bookkeeper's testimony, that the account into which the Union Pacific checks were deposited was the same account that defendant used to pay Averill's wages (and other business operating expenses, including defendant's own salary), knowing that the business operations would include continued overbilling of Union Pacific during the charged period. *See State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988) (fact-finder makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law."). Based on the evidence presented, jurors rationally found that defendant knowingly gave, transferred, maintained an interest in, and/or otherwise made available the value of the checks from Union Pacific with a known purpose of committing or furthering the commission of the overbilling scheme. The crime of money laundering is, for all practical purposes, a process by which ill-gotten gains are commingled with clean funds and used to perpetuate criminal activity. The notion that the circumstances in this case constitute anything other than money laundering is plainly belied by the record.

For the foregoing reasons, jurors rationally found that defendant knowingly gave, transferred, maintained an interest in, and/or otherwise made available things of value which he knew to be for the purpose of committing or furthering the commission of the criminal overbilling scheme. We therefore reverse and vacate the First Circuit's ruling and remand to that court for consideration of the two remaining grounds in defendant's motion for post-judgment verdict of acquittal.

**REVERSED AND REMANDED.**

**SUPREME COURT OF LOUISIANA**

**No. 2015-K-1120**

**STATE OF LOUISIANA**

**VERSUS**

**MARTIN G. LEMOINE**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF POINTE COUPEE**

**CRICHTON, J., dissents and assigns reasons:**

I respectfully dissent. To be clear, I believe defendant's conduct was wrong—the evidence at trial appears to prove the crime of theft. Nonetheless, defendant was charged with money laundering under La. R.S. 14:230(B)(2), not theft under La. R.S. 14:67(A). And because I believe La. R.S. 14:230(B)(2) is subject to multiple reasonable interpretations, the rule of construction is to resolve any doubt in favor of lenity. *See State v. Freeman*, 411 So.2d 1068, 1072 (La. 1982).

As Justice Scalia—writing for a plurality of the United States Supreme Court—instructs:

> This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce [the Legislature] to speak more clearly and keeps courts from making criminal law in [the Legislature's] stead.

*United States v. Santos*, 553 U.S. 507, 514, 128 S.Ct. 2020, 2025, 170 L.Ed.2d 912 (2008) (applying the rule of lenity to affirm a lower court's vacating of a money-laundering conviction). Therefore, I would construe La. R.S. 14:230(B)(2) in a manner that favors defendant in this case and affirm the lower courts' determinations that no reasonable juror could find beyond a reasonable doubt that

the State proved this defendant committed the crime of money laundering under

La. R.S. 14:230(B)(2).

**SUPREME COURT OF LOUISIANA**

**No. 2015-K-1120**

**STATE OF LOUISIANA**

**VERSUS**

**MARTIN G. LEMOINE**

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FIRST CIRCUIT, PARISH OF POINTE COUPEE**


**GENOVESE, JUSTICE,** dissents for the reasons assigned by Justice Crichton.