# NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## NUMBER 2024 KA 0232

### STATE OF LOUISIANA

### VERSUS

### KRISTIAN GAUDET

**Judgment Rendered:** DEC 3 0 2024

\* \* \* \* \* \*

Appealed from the
Seventeenth Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Docket Number 584830
The Honorable F. Hugh Larose, Judge Presiding

\* \* \* \* \* \*

Kristine M. Russell
District Attorney
Joseph S. Soignet
Assistant District Attorney
Thibodaux, Louisiana

Counsel for Appellee
State of Louisiana

Mark D. Plaisance
Marcus J. Plaisance
Prairieville, Louisiana

Counsel for Defendant/Appellant
Kristian Gaudet

\* \* \* \* \* \*

**BEFORE: GUIDRY, C.J., PENZATO, AND STROMBERG, JJ.**

Stromberg, J., concur.

**GUIDRY, C.J.**

The defendant, Kristian Gaudet, was charged by amended bill of information with racketeering (Count 1), money laundering (Count 2), and eight counts of theft where the value of the property taken or misappropriated by the defendant was $25,000 or more (Counts 3-7 & 9-11),[1] in violation of La. R.S. 15:1353, La. R.S. 14:230, and La. R.S. 14:67, respectively.[2] The defendant pled not guilty to the charges. Following a jury trial, he was found guilty of the responsive offenses of theft over $500 on counts five and ten and guilty as charged on the remaining eight counts. The defendant's motion for new trial and motion for post-verdict judgment of acquittal were denied by the court.

For the racketeering and money laundering convictions, the trial court sentenced the defendant on each count to twenty-five years imprisonment at hard labor. (Counts 1 & 2). For the theft of property valued at $25,000 or more convictions, the trial court sentenced the defendant on each of these counts to fifteen years at hard labor. (Counts 3, 4, 6, 7, 9 & 11). On the responsive verdicts for thefts of property valued at $500 or more convictions, the trial court sentenced the defendant on each of these counts to five years at hard labor and ordered all of the sentences to be served concurrently with one another (Counts 5 & 10). Following an Article 875.1 hearing, the trial court ordered the defendant to pay restitution to the victims. The defendant now appeals, challenging the sufficiency of the evidence on all ten counts. For the reasons that follow, we affirm the convictions and sentences.

---

[1] The victims in Count 3 are Darrel and Sandy St. Pierre. The victims in Count 4 are Rod and Debra Doucet. The victims in Count 5 are Herman and Cindy Williams. The victims in Count 6 are Perry and Marie Felarise. The victim in Count 7 is Yvette Terrebonne. The victim in Count 9 is James Bradford. The victim in Count 10 is Charles Plaisance. The victim in Count 11 is Melvin Guidroz, Jr.

[2] Prior to trial, the State nolle prossed the theft charges in Counts 8 and 12 and the exploitation of persons with infirmities charges in Counts 13 through 16.

## FACTS

The defendant owned Kris Gaudet Insurance and Financial Services, Incorporated. He provided products such as health insurance and acted as a financial agent for investors. Between 2010 and 2018, the defendant received thousands of dollars from individuals to make investments. Following a theft complaint by Sandy and Darrel St. Pierre regarding one of their investments, Detective Christian Eagan with the Lafourche Parish Sheriff's Office ("LPSO") began investigating the defendant. Following the investigation, the defendant was arrested for the instant offenses.

## SUFFICIENCY OF THE EVIDENCE

In three interrelated assignments of error, the defendant argues the evidence presented by the State fails to sustain the convictions for theft, racketeering, and money laundering. He specifically argues: (1) because none of his clients lost any money prior to the State's investigation and his arrest, and those clients with long-term annuities did not expect any immediate return, the jury erred in convicting him of theft; (2) because the State failed to prove he engaged in an enterprise to solicit investment funds through coercive means to launder those funds or deprive his clients of their funds, the conviction for racketeering should be reversed; and (3) because he did not commit theft but transferred funds throughout various accounts as would any investment advisor, his conviction for money laundering must be reversed.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging the sufficiency of the evidence, this court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781,

3

2789, 61 L.Ed.2d 560 (1979). See also La. C. Cr. P. art. 821(B); State v. Ordodi, 06-0207, p. 10 (La. 11/29/06), 946 So. 2d 654, 660; State v. Mussall, 523 So. 2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821(B), is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. State v. Patorno, 01-2585, p. 5 (La. App. 1st Cir. 6/21/02), 822 So. 2d 141, 144.

When a conviction is based on both direct and circumstantial evidence, the reviewing court must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and the facts reasonably inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Wright, 98-0601, p. 3 (La. App. 1st Cir. 2/19/99), 730 So. 2d 485, 487, writs denied, 99-0802 (La. 10/29/99), 748 So. 2d 1157, and 00-0895 (La. 11/17/00), 773 So. 2d 732.

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Duhon, 18-0593, p. 29 (La. App. 1st Cir. 12/28/18), 270 So. 3d 597, 619, writ denied, 19-0124 (La. 5/28/19), 273 So. 3d 315. The due process standard of Jackson "does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to

second guess the credibility determinations of the fact finder necessary to render an honest verdict." State v. Calloway, 07-2306, p. 10 (La. 1/21/09), 1 So. 3d 417, 422 (per curiam).

Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential. La. R.S. 14:67(A). Under La. R.S. 15:1352(A), "racketeering activity" means "committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit" specific crimes. Some of the specific crimes include: money laundering and theft, among others. See La. R.S. 15:1352(76) & (37). The section of the money laundering statute under which the defendant was found guilty, La. R.S. 14:230(B)(1), makes it unlawful to knowingly:

> Conduct, supervise, or facilitate a financial transaction involving proceeds known to be derived from criminal activity, when the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or the control of proceeds known to be derived from such violation or to avoid a transaction reporting requirement under state or federal law.

The issue before us is whether the jury correctly found the evidence was sufficient to support the convictions for theft, racketeering, and money laundering. See Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.

## TRIAL TESTIMONY AND EVIDENCE

At trial, Sandy St. Pierre testified that in 2008, using the defendant as their agent, they began investing their money into annuities. Prior to the incident in question, the St. Pierres purchased twelve annuities with established, legitimate companies through the defendant. Mrs. St. Pierre would place her money in annuities, then take the interest earned and roll it over into another annuity. In July

2017, the defendant visited the St. Pierre's home and advised the couple that if they invested with a company called Winston Financial ("Winston"), they were guaranteed to earn five percent interest for the first five years. Thereafter, they would earn three percent interest on their investment. Based upon the defendant's advice, Mrs. St. Pierre wrote a $350,000 check payable to Winston. Mrs. St. Pierre testified the defendant represented to her that he was only acting as an agent and never revealed that he was the owner of Winston.

On October 15, 2018, the defendant visited the St. Pierre's home and asked the couple if they wanted to invest an additional $250,000 with Winston. Mrs. St. Pierre pointed out that she understood an investor could only place up to $600,000 in an annuity and still be insured. In response, the defendant stated: "Oh, right, right ... I forgot." Mrs. St. Pierre became suspicious and indicated she would get back to him. The next day, Mrs. St. Pierre called the phone number listed on the Winston policy and discovered that neither the phone number nor the addresses listed on the policy were valid.

When Mrs. St. Pierre looked at the policy more closely, she noticed it appeared to have been "just slapped together from different ... annuities." She then contacted the defendant, and he gave her three different phone numbers that belonged to three other annuity or insurance companies. Later that day, the defendant texted Mr. St. Pierre a phone number to call with instructions to put in the last four or five numbers of their policy, which he indicated should provide the information they were seeking. However, when Mrs. St. Pierre called the number, an automated message played that did not give the option to put in the policy number and then the phone cut off.

The next morning, Mrs. St. Pierre called the same number again. This time, before she could enter her policy number, the automated system started relaying her annuity information. When her daughter called the number, it did the same

6

thing. Concerned that anybody could call the number and hear her personal financial information, Mrs. St. Pierre again called the defendant, who was unable to answer any of her questions. Mrs. St. Pierre then contacted a friend who worked at her bank and explained the situation. The friend promised to investigate the matter and get back with her.

In the interim, the defendant contacted Mr. St. Pierre and told him that he had contacted Winston via email, and directed the St. Pierres to email the company. In the email the defendant allegedly received from Winston's customer service, the company indicated their operations were out for several days as a result of damage to their office and servers. The email contained a phone number and a Tallahassee, Florida address. When Mrs. St. Pierre looked up the Tallahassee address, it belonged to Banker's Life, not Winston. The Winston annuity policy that the defendant hand-delivered to Mrs. St. Pierre contained the signatures of Lee Launer as President, and Eric Marhoun as Secretary. An internet search revealed that Lee Launer was the CEO and legal owner of Fidelity and Guarantee Life Insurance and Eric Marhoun was the vice president.

When Mrs. St. Pierre's friend who worked at the bank got back with her, he indicated that it was in her best interest to contact the bank's fraud department. When Mrs. St. Pierre contacted her bank's fraud department, she was informed that "Winston Financial has Kris Gaudet's name written all over it" and she was instructed to file a police report, which she did. Shortly thereafter, they requested to withdraw their investment funds from Winston. However, the St. Pierres did not receive, as the defendant advised, their money back within ten business days or a check from Winston. Instead, on December 5, 2018, $125,000 was deposited directly into their bank account from an unidentified source. In January 2019, a second deposit was made to their bank account from an unidentified source in the amount of $112,500. After that date, no more deposits were made. Mrs. St. Pierre

7

testified that she did not authorize the defendant to invest their $350,000 in real estate nor did she authorize the defendant to use her investment to operate his insurance and financial consulting agency.

Mrs. St. Pierre testified on cross-examination that she believed her investment was going into an insurance group, and she trusted that she would get her money back when she needed it. She further testified that all of her other money was in annuities and this was no different. According to Mrs. St. Pierre, when the defendant brought the annuity contract to her home in February 2018, she did not look at it at that time. Mrs. St. Pierre testified that after the defendant's arrest, he did not offer her the remaining $112,500 balance from her $350,000 investment.

Charles Plaisance testified at trial that he and his wife, Lisa Plaisance, lived in Cut Off, Louisiana. Friends, whom Mr. Plaisance trusted, referred him to the defendant. On December 20, 2012, Mr. Plaisance wrote a $30,000 check payable to Winston, and he completed an annuity application.[3] A couple of days later, Mr. Plaisance picked up the Winston Individual Deferred Annuity Contract from the defendant's secretary at his office. Mr. Plaisance testified the purpose of the $30,000 check was to invest in an annuity and, based upon the defendant's representations, he believed that Winston was a financial institution. The defendant did not tell Mr. Plaisance that he was the owner of Winston. Mr. Plaisance indicated he never received quarterly statements and stated when he decided to invest with Winston, he was looking for a safe investment. According to Mr. Plaisance, he has not gotten any money from the Winston investment nor was he returned his $30,000 investment. Mr. Plaisance testified that he did not authorize the defendant to use his money to invest in real estate, to operate his

---

[3] According to Mr. Plaisance, he did not write "Certainty Select 8," at the top of the application nor did he select the annuity commencement date of January 2, 2051, which is noted on page two of the contract.

8

insurance and investment planning agency, or to do whatever he wanted with the money.

According to Mr. Plaisance, before he wrote the $30,000 check, he and the defendant discussed the investment in detail, and the defendant showed him a printout that contained six or seven companies including Winston. The return for Winston the first year was six or seven percent and three percent thereafter, which was better than the other institutions on the list. Mr. Plaisance testified it was his understanding that he was getting a fixed annuity for ten years. He agreed, however, that the terms of the Winston contract have not come to completion and that it is still in effect until January 2, 2051. Mr. Plaisance testified that he has never made a request to withdraw his money from Winston.

Cindy Williams testified that she was married to Herman Williams, Jr., who died in August 2021. On October 14, 2013, Mrs. Williams wrote a $27,000 check payable to Kris Gaudet Insurance and Financial Services for the purpose of setting up a SEP fund.[4] After several months passed without receiving a copy of the policy, Mrs. Williams's husband went to the defendant's office and was given an individual deferred annuity contract. In 2017, the couple decided to invest additional money. On April 18, 2017, Mrs. Williams wrote a $6,500 check to Winston from her husband's business account.

Mrs. Williams indicated the $6,500 was to invest in an IRA, which she discussed with the defendant prior to writing the check. She noted they intended to use the money when they retired at age 65. However, the annuity commencement date noted in the contract was October 15, 2046. Mrs. Williams found this strange because her husband would have been ninety years old at that time. Mrs. Williams testified that she never received quarterly statements from Winston and, to date, she had not received a return on the Winston investments. She indicated the

---

[4] SEP stands for Simplified Employee Pension plan. The couple's accountant indicated a SEP is a retirement fund that is put aside until you reach a certain age.

9

defendant never advised her that he intended to use the $27,000 investment to run his business or for his personal use and, if he had, she would not have given it to him. She further testified that they did not want to invest in real estate, and the defendant never told them he was borrowing money from their investment funds. On cross-examination, Mrs. Williams testified that she was not aware of the annuity commencement date on the SEP policy until it was pointed out to her at trial and stated her husband would not have agreed to keep the money in the annuity until 2046. Mrs. Williams acknowledged that as of the date of the defendant's arrest, the term of the annuity had not expired.

Marie Felarise testified at trial that she is married to Perry Felarise, Sr., who worked as a tugboat captain for forty years. The Felarises had known the defendant for over twenty years and started using his investment services in 2004. In 2018, the couple wanted to set up a retirement account through the defendant. They executed a $232,194.23 cashier's check that was drawn on their Regions Bank account and made payable to Winston. Mrs. Felarise testified that in connection with their investment, her husband received a stack of documents from the defendant. According to Mrs. Felarise, the defendant did not tell her he was the owner of Winston. She testified that she did not authorize the defendant to use her money to invest in real estate in Louisiana or Mississippi. Similar to the other victims, the Felarises never received quarterly or annual statements regarding their Winston investments and have never received money back. Mrs. Felarise indicated had the defendant explained to her that he intended to borrow against their money, she would not have agreed to that.

Florence "Flo" Bradford testified that she lives in Lockport, Louisiana, and she was married to James Bradford, who passed away prior to trial. On January 8, 2019, Mrs. Bradford and her husband provided the defendant a check for $100,000 that was made payable to Winston. On cross-examination, Mrs. Bradford testified

that no paperwork was ever issued and they never requested a surrender or withdrawal of the money from Winston.

Yvette M. Terrebonne testified at trial that she worked at the Lafourche Parish School Board and participated in the Teachers' Retirement System of Louisiana ("TRSL"). Ms. Terrebonne decided to invest her retirement funds and she instructed the TRSL to issue a $42,705.19 check to Winston Financial in August 2017. Ms. Terrebonne made the decision to invest in Winston after having a discussion with the defendant, to whom she was referred by several friends. Ms. Terrebonne indicated she began receiving $450 monthly payments around December 2017, which were deposited directly into her account. However, in April 2019, the payments stopped coming.

Despite the defendant's assurance, Ms. Terrebonne never received any paperwork documenting her investment. Ms. Terrebonne testified she did not authorize the defendant to use her money to invest in real estate, in a boat company, to operate his insurance agency, or to pay back other victims. Ms. Terrebonne agreed that she was supposed to be earning interest on her investment money but could not recall the interest rate. She agreed that prior to the defendant's arrest, she had no reason to believe that she was being deprived of her money, as she was getting a deposit every month. Ms. Terrebonne further agreed that when she met with Det. Eagan in February 2019, he convinced her that her money had been taken. Therefore, she took Det. Eagan's advice and filed charges against the defendant.

Melvin Guidroz, Jr., testified that he lived near the defendant and went to him for investment advice. In 2015, he placed $50,000 in a fixed IRA for a period of three years. In 2018, his investment was valued at $54,742.72, and the defendant advised him to invest with Winston. Mr. Guidroz then rolled over his investment and wrote a $54,742.72 check payable to Winston, dated July 2, 2018.

11

Mr. Guidroz stated he believed he was investing in another three-year IRA, and he picked the maturity date because in three years he would have been at an age where he could cash out without being penalized.

Similar to the other investors, Mr. Guidroz did not receive paperwork documenting his investment with Winston, and the defendant did not reveal he was the owner of the company. Mr. Guidroz testified he has not received any money from his 2018 investment with Winston. According to Mr. Guidroz, he received a 1099 from the IRS because someone cashed out his 2018 IRA. He testified that "[s]omebody stole it." Mr. Guidroz further testified that he did not authorize the defendant to use any of his funds to invest in real estate in Louisiana or Mississippi or to run his insurance agency. Mr. Guidroz did not request to withdraw the money from his 2018 investment, as he never got a chance to speak with the defendant.

Rod Doucet testified at trial that he and his wife, Deborah Doucet, live in Galliano, Louisiana. Mr. Doucet worked for Walmart for thirty-one years, and he participated in a profit sharing 401(k). In April 2018, he lost his job. After initially going to the defendant's office to purchase healthcare insurance, the Doucets set up an appointment with him to discuss investing the $198,179.98 Mr. Doucet had earned from his 401(k). At the meeting, the defendant told Mr. Doucet he had found a company in which Mr. Doucet could safely invest his money and showed him a layout documenting the interest his investment would earn. With the Doucet's permission and in their presence, the defendant called Merrill Lynch and instructed the agent to make the $198,179.98 check payable to Winston. The check was dated April 30, 2018. Mr. Doucet testified this was all the money he had for retirement. According to Mr. Doucet, he asked the defendant if they owed anything for investing with him. In response, the defendant told him that the companies he brought people to paid him in return.

12

Mr. Doucet testified the defendant did not tell him that Winston was actually an account under his personal name or that he was the principal and/or the owner. If he had known this, Mr. Doucet indicated he would not have invested with Winston. Mr. Doucet did not recall filling out any paperwork in connection with his Winston investment and noted he did not expect to receive any statements, since the defendant informed him those were sent on a yearly basis. Mr. Doucet testified that he did not give the defendant authority to use $170,000 of his investment money to purchase a home for himself in LaRose, Louisiana. Mr. Doucet further testified that he did not agree to nor did he authorize the defendant to use his investment funds to run his business or pay personal expenses. According to Mr. Doucet, since the day he gave the defendant the $198,179.98 check, he has not received any money from him. Mr. Doucet did not know his investment was at risk until he received a phone call from Det. Eagan. Mr. Doucet has not spoken to the defendant since the day he gave him the check, and he has not asked to withdraw his investment money.

Det. Eagan testified the St. Pierres informed him they had given the defendant money to purchase an annuity with Winston, a company that was allegedly based in Des Moines, Iowa. Det. Eagan contacted the Iowa Secretary of State's Office, and learned that Winston was not a registered business in Iowa. The St. Pierres' investment money was deposited into a Capital One bank account. Therefore, Det. Eagan focused his investigation on that account, and he obtained a search warrant and subpoenaed the bank records for Winston from Capital One.

Det. Eagan observed that a portion of the St. Pierres' money was transferred to a second account, which was under the name of CGC Holdings. A search with the Louisiana Secretary of State revealed the defendant was the registered agent and managing member for CGC Holdings. During his investigation, Det. Eagan saw numerous transfers from the original Winston bank account, and he discovered

13

that the defendant had two other accounts including one in his personal name and one under Kris Gaudet Insurance Services.[5] While examining the Winston bank records, Det. Eagan saw a check for almost $200,000 that was written by Rod Doucet to Winston that was dated May 8, 2018. Approximately eight days later, a check for $170,000 payable to South Lafourche Bank was written from the Winston account. Det. Eagan learned the $170,000 was used by the defendant and his girlfriend, Kendra Dupre, to purchase a residence on West 16th Street in Larose, Louisiana. During the course of his investigation, Det. Eagan discovered twelve other victims.

Mr. John Collier was qualified as an expert accountant and CPA and a certified fraud examiner. He testified his analysis revealed two main categories providing evidence of fraud in this case. First, the bank statements, transfers, deposit, and checks contained evidence of fraud. The second was in the information packets and materials that were provided to the investors to get them to invest their money. According to Mr. Collier, the investor forms appeared to have been manipulated from original source documents from other companies. The documents also appeared to have information pertaining to other companies which the defendant attempted to pass off as relating to Winston.

Mr. Collier referenced the welcome letter from Winston to Mr. Felarise, which included the signature of Lee Launer. Mr. Collier testified that his research indicated Lee Launer was the chief executive officer for Fidelity Guarantee Life, a large life insurance company. Mr. Collier believes Mr. Launer is retired and he could not identify his relationship with Winston. Mr. Collier testified that several of the Winston documents contained information relating to other legitimate investment companies such as the logo, addresses, and phone numbers. He further testified the most critical piece of information on the Winston annuity application

---

[5] Those accounts ended in 2218 and 4522, respectively.

that was completed for Mr. Felarise is the "Product" he was supposed to be purchasing. Mr. Collier testified that the "Product" referenced in the application was a Certainty Select Five Year, an annuity brand that is only sold by EquiTrust, which has a registered trademark.

Mr. Collier also pointed out several variations of the name on the documents he examined, noting he saw "Winston Financial," "Winston Life Insurance and Financial Group," and "Winston Group." He testified there is not a consistent naming nomenclature which, in and of itself, indicates a haphazard cutting and pasting and putting a name on a document. Mr. Collier explained that for at least three of the investors, the annuity application specified the product they were purchasing; he found no evidence suggesting Mr. Gaudet was permitted to invest the money received from these investors in anything other than the products listed in the annuity applications. He testified the defendant falsifying documents and signatures and then using them to entice a third-party to invest or provide money would be considered a material misrepresentation.

Mr. Collier testified regarding asset tracing, which refers to tracing money as it is deposited into one account and then subsequently transferred to other accounts until it is either expended as a purchase or a check. Mr. Collier studied the defendant's three business accounts—the Kris Gaudet Insurance and Financial Services account (ending in 4522), the Winston Financial account (ending in 2682), and the CGC Holdings account (ending in 9196)—and considered that the defendant could transfer money between these three accounts. Mr. Collier also considered the defendant's personal account, assuming that if money was transferred to his personal account then it was the defendant's money to use for something personal. Mr. Collier stated it did not appear the defendant invested the victims' funds into the types of investments to which they testified or requested on the written documents they signed. He further testified his examination of the

15

bank information revealed that the defendant acquired the investors' funds for his own personal expenditures as well as for day-to-day operations. Mr. Collier found this evidence when he performed an asset tracing of the victims' funds deposited into defendant's accounts and his subsequent transfers of those funds to other accounts and the usage and expenditures of those funds.

For instance, an asset trace of the defendant's CGC Holdings account from September 2017 reflected a payment was made to two other investors (namely Linton and Martha Griffin) for $51,590.31. In a letter to Ameritas, defendant noted the source of the funds paid to the Griffins was the liquidation of a property in Louisville, Mississippi. However, a study of the Winston Financial account (ending in 2682) reflects the beginning August 2017 balance was $12.69. On August 31st, the defendant made a $200,000 deposit to the CGC Holdings account. Subsequently, deposits were made to the Winston account from Ms. Terrebonne's $42,705.19 check and from the St. Pierres' $350,000 check. Mr. Collier observed that there was only $500 in the CGC Holdings account until the defendant transferred the investors' deposited money into that account. Then that money was used to pay the Griffins, which Mr. Collier noted contrasted the defendant's statement to Ameritas that the money he paid to them came from the sale of real estate.

Regarding the $112,500 payment to the St. Pierres on January 10, 2019, Mr. Collier found the source of that payment was from Mr. Bradford's $100,000 investment on January 9th, which the defendant deposited into the Winston Financial account. One day later, instead of investing the money as Mr. Bradford requested, the defendant transferred Mr. Bradford's investment money to the CGC Holdings account and then deposited it into Mrs. St. Pierres' bank account. Mr. Collier further testified that within five days of receiving Ms. Terrebonne's $42,705.19 check and depositing it into the Winston Financial account, the

16

defendant transferred $9,000 of those funds into his personal account. In addition, he transferred $6,000 of her money into the Kris Gaudet Insurance and Financial Services account ("KGIF"), which had a $174.78 balance prior to that deposit. Thereafter, the defendant used Ms. Terrebonne's money to make a $68.64 payment to Sprint Wireless, made ATM withdrawals totaling $805, and wrote an $800 check.

Mr. Collier further observed payments to Uber, the Omni Royal Orleans for $840.45, the Red Room, and several restaurants in New Orleans including Ruth's Chris Steak House for $269.27. He also observed credit card payments to Chase and Capital One. Mr. Collier testified that while the defendant's usage of the transferred money may have been for his business or personal expenses, it did not appear to have been on behalf of Ms. Terrebonne's investment. In Mr. Collier's study of the Winston bank account, he noted the beginning balance for September 2017 was $123,545, which was the investors' money. Mr. Collier testified that in reviewing the hundreds of checks that were written by the defendant from the KGIF account, he did not identify that any were for the type of investment that his investors requested. He observed that the defendant continued to make transfers of the investors' money to his personal and business bank accounts. He further observed that the defendant used funds from the Winston account to make three payments to Capital One and transfers of $3,000 to each of his bank accounts ending in 2281 and 4522. A study of these two bank accounts revealed that following a deduction for a check, there was $2,800 left in the account ending in 4522.

Mr. Collier did observe deposits to account number 4522 from Ameritas Life Insurance Direct and Acadia Commissions for the defendant's work, but noted the largest amount of money in that account was from his transfers to that account from the Winston account, which contained comingled funds. In May 2018, Mr.

Doucet's $198,179.98 check was deposited into the Winston Financial bank account (ending in 2682). In Mr. Collier's study of the account, he observed that the defendant transferred some of Mr. Doucet's investment money to his personal account and to the KGIF account. Thereafter, the defendant withdrew $170,000, which documents show was used for the purchase of a home. Mr. Collier noted that had the defendant not received Mr. Doucet's deposit, he would have only had $265.98 from which to withdraw money.

In August 2018, following the deposit of the Felarises' investment check for $232,194.23 and Mr. Guidroz's $54,742.72 investment check into the Winston account, Mr. Collier again observed that the defendant transferred $7,000 of their investment money to his other accounts. The defendant subsequently used the money to make purchases at restaurants, pay bills, and buy items unrelated to investments. In addition, he purchased plane tickets with Southwest Airlines, building materials, and made credit card payments. Mr. Collier observed the defendant consistently making purchases to the extent that, at one point, his bank account had a negative balance, and he had to make another transfer of the investment funds to get the account back to a positive balance. Mr. Collier testified that his review of the defendant's bank accounts showed a pattern of behavior regarding the investment funds he received from the victims from August 2017 through November 2018. He further testified in the instances where the defendant paid an investor back, the source of the money to make those payments was from other investors' money.

## THEFT BY FRAUD

As defined in La. R.S. 14:67(A), theft consists of the following elements: (1) the misappropriation or taking of anything of value, (2) which belongs to another, (3) without consent or by means of fraudulent conduct, practices, or representations, and (4) with the intent to permanently deprive the other of the

object of the misappropriation or taking. State v. Millennium Health Care Servs., 19-1143, p. 12 (La. App. 1 Cir. 6/22/21), 328 So. 3d 1168, 1175-76, writ denied, 21-01417 (La. 12/7/21), 328 So. 3d 425. The gist of theft by fraudulent conduct or misrepresentations is a misappropriation or the taking of money by fraudulent conduct or representations. "Fraudulent conduct" is a conclusion of law. Millennium Health Care Servs., 19-1143 at 13, 328 So. 3d at 1176 (citing State v. Heymann, 235 So. 2d 78, 80 (La. 1970)). Theft is a specific intent crime. Millennium Health Care Servs., 19-1143 at 12, 328 So. 3d at 1176. Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of defendant. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. State v. Dickerson, 16-1336, p. 5 (La. App. 1st Cir. 4/12/17), 218 So. 3d 633, 638, writ denied, 17-1147 (La. 8/31/18), 251 So. 3d 1062.

The evidence at trial showed the defendant solicited the victims to invest their retirement money in Winston by misrepresenting to them that it was a legitimate annuity company. He further misrepresented to the victims that he was only acting as an agent and never revealed that he was the owner. The victims' investment money was deposited into the Winston account and then transferred to other accounts under his business and personal name. He then converted the money to his personal use to make purchases such as a home, invest in real estate, pay his bills, and operate his insurance agency. The defendant did not use his clients' money for the purpose that it was given to him, which was to invest in safe, low risk, annuities.

In Counts 3, 4, 6, 7, 9 and 11, the defendant was found guilty of theft of property valued at $25,000 or more. The State met its burden of proving the defendant intended to permanently deprive the St. Pierres, the victims in Count 3 of their $350,000 investment with Winston when he, without their consent, transferred their deposited money to a different bank account and used the money to pay back another client. The State met its burden of proving the defendant committed theft from the Doucets, the victims in Count 4, where the evidence shows the defendant used $170,000 of their $198,179.98 investment money to purchase a home for himself. The State met its burden of proving the defendant intended to permanently deprive Perry and Marie Felarise, the victims in Count 6, of their $232,194.23 investment where the evidence shows the defendant used the money to make purchases at restaurants, pay bills, purchase plane tickets, building materials, and make credit card payments.

The State met its burden of proving the defendant committed theft from Ms. Terrebonne, the victim in Count 7, where the evidence shows the defendant used portions of her $42,705.19 investment with Winston to pay back another client, as well as make ATM withdrawals, make a payment to Sprint wireless, and write an $800 check. Mr. Collier testified the defendant transferred Mr. Bradford's investment money to the CGC Holdings account and deposited it into Mrs. St. Pierre's bank account. Accordingly, the State met its burden of proving the defendant intended to permanently deprive Mr. Bradford, the victim in Count 9, of their $100,000 investment with Winston. Mr. Collier testified the defendant transferred $7,000 from an account that included Mr. Guidroz's investment money to his other accounts. Mr. Guidroz testified he received a 1099 from the IRS because someone cashed out his 2018 IRA. He testified that "[s]omebody stole it." The State met its burden of proving the defendant intended to permanently deprive Mr. Guidroz, the victim in Count 11, of his $54,742 investment.

In Counts 5 and 10, the defendant was found guilty of theft of property valued at $500.00 or more. The State met its burden of proving the defendant intended to permanently deprive Herman and Cindy Williams (the victims in Count 5) of their $33,500 investment with Winston, where Mrs. Williams testified her husband requested to set up a retirement fund and the defendant instead gave him an annuity with Winston. Mrs. Williams testified she had not received a return on the Winston investments. The victim in Count 10, Mr. Plaisance, wrote a $30,000 check payable to Winston on December 20, 2012. At trial, he testified: "To this day, I have never seen anything from Winston Financial." Given the foregoing testimony, the State met its burden of proving the defendant intended to permanently deprive Mr. Plaisance of his $30,000 investment.

Mr. Collier testified that he observed that the defendant paid Ms. Terrebonne $450.00 over many months, such that she received $7,500 of her investment money back. He further observed that the St. Pierres received $237,500 of their $350,000 investment back. Other than these partial repayments, Mr. Collier did not observe any other evidence that showed the defendant returned or properly invested the victims' funds as he represented he would.

In light of the fact the victims gave the defendant funds to purchase annuities with a company that did not provide annuities, and he transferred the ill-gotten funds to his personal and other business accounts and then converted the funds for his own personal use and to run his business, the defendant's argument the jury erred in convicting him of theft because his clients with long-term annuities did not expect any immediate return is meritless. After reviewing the evidence presented at trial, we find the State proved that the defendant intended to permanently deprive the victims of the money they invested in Winston. This assignment of error is without merit.

# RACKETEERING

The Louisiana Racketeering Act is contained in La. R.S. 15:1351-1356. Under La. R.S. 15:1352(C), a "[p]attern of racketeering activity" is defined as: engaging in at least two incidents of racketeering activity that have the same or similar intents, results, principals, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, provided at least one of such incidents occurs after August 21, 1992 and that the last of such incidents occurs within five years after a prior incident of racketeering activity. An "enterprise" means "any individual, sole proprietorship, partnership, corporation or other legal entity, or any unchartered association, or group of individuals associated in fact and includes unlawful as well as lawful enterprises and governmental as well as other entities." La. R.S. 15:1352(B).

There is limited jurisprudence regarding the Louisiana Racketeering Act. Thus, Louisiana appellate courts have looked to federal jurisprudence interpreting the federal Racketeer Influenced and Corrupt Organizations Act (RICO). See State v. Davenport, 16-0223, p. 17 (La. App. 4th Cir. 10/18/17), 316 So. 3d 888, 903, writ denied, 17-1950 (La. 10/8/18), 253 So. 3d 792, and writ denied, 17-1947 (La. 10/8/18), 253 So. 3d 797. In H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the United States Supreme Court discussed the federal RICO pattern requirement, noting "criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." See H.J. Inc., 492 U.S. at 240, 109 S.Ct. at 2901.

It was further noted that to establish a RICO pattern it must be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity. See H.J. Inc., 492 U.S. at 240, 109 S.Ct. at 2901.

Thus, to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity. See State v. Ficklen, 2017-995, pp. 10-11 (La. App. 3d Cir. 5/2/18), 247 So. 3d 1075, 1082. See also H.J. Inc., 492 U.S. at 241, 109 S.Ct. at 2902.

Here, the jury could have reasonably concluded the State proved the existence of an enterprise for the purpose of racketeering. The foregoing trial testimony and evidence shows the defendant, individually, engaged in a pattern of theft of his clients' investment funds. He accomplished the theft by misrepresenting to his clients he would accept their money and invest it in Winston, which he represented would earn a five percent interest on their money over a five-year term. The defendant had the clients complete annuity applications wherein he misrepresented to them what they were investing in and, in one instance, indicated the client was buying a product that Winston was not authorized to sell. The company also was not located in Des Moines, Iowa or registered to do business in that state.[6] Furthermore, there is no evidence that Winston had a relationship with Lee Launer or EquiTrust. The testimony reflects over a period of at least one year or more, the defendant repeated this pattern of misrepresentation with the St. Pierres, Mr. Plaisance, the Felarises, Mr. Doucet and Ms. Terrebonne in order to fraudulently obtain their investment money for his own personal use. Accordingly, this assignment of error has no merit.

## MONEY LAUNDERING

Under La. R.S. 14:230(B), it is unlawful for any person to knowingly do any of the following:

*****

---

[6] A check of the Louisiana Secretary of State's website revealed Winston Financial was registered in Louisiana by Kristian Gaudet and listed his address as 236 West 44th Street, Cutoff, Louisiana. The trademark service name was Winston Financial.

23

(2) Give, sell, transfer, trade, invest, conceal … maintain an interest in, or otherwise make available anything of value known to be for the purpose of committing or furthering the commission of any criminal activity.

(3) Direct, plan, organize, initiate, finance, manage, supervise, or facilitate the transportation or transfer of proceeds known to be derived from any violation of criminal activity.

(4) Receive or acquire proceeds derived from any violation of criminal activity, or knowingly or intentionally engage in any transaction that the person knows involves proceeds from any such violations.

(5) Acquire or maintain an interest in, receive, conceal, possess, transfer, or transport the proceeds of criminal activity.

(6) Invest, expend, or receive, or offer to invest, expend, or receive, the proceeds of criminal activity.

"Criminal activity" means any offense, including conspiracy and attempt to commit the offense, that is classified as a felony under the laws of this state or the United States or that is punishable by confinement for more than one year under the laws of another state. La. R.S. 14:230(A)(1). "Funds" means electronic or written checks, drafts, or other electronic or written instruments or orders for the transmission or payment of money. See La. R.S. 14:230(A)(2)(d).

Because Louisiana's money laundering statute closely resembles 18 U.S.C. § 1956(a)(1)(B)(i), the federal jurisprudence interpreting the latter statute is highly instructive. State v. Dudley, 06-1087, p. 19 (La. App. 1st Cir. 9/19/07), 984 So. 2d 11, 24. Under federal law, 18 U.S.C. § 1956(a)(1)(B)(i) criminalizes conduct designed to conceal or disguise the source of proceeds of specified unlawful activity even if the defendant does not conceal his own identity in the process. See United States v. Hall, 434 F.3d 42, 50-51 (1st Cir. 2006). Factors helpful in determining whether a transaction was designed to conceal include: statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features

24

of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on the practices of criminals. Duhon, 18-0593 at 16, 270 So. 3d at 612 (citing United States v. Magluta, 418 F.3d 1166, 1176 (11th Cir. 2005), cert. denied, 548 U.S. 903, 126 S.Ct. 2966, 165 L.Ed.2d 949 (2006)).

The Louisiana legislature has designated money laundering as a crime of general intent. See La. R.S. 14:11. In contrast, the federal money laundering statute exacts a higher burden of proof by requiring proof that a transaction was conducted with specific intent to promote the carrying on of unlawful activity.[7] See State v. Lemoine, 15-1120, p. 4 (La. 5/3/17), 222 So. 3d 688, 692 (per curiam). As further noted in Lemoine, money launderers often mix the fruit of their crimes with legitimately-acquired assets, assuming detection of the dirty funds will be more difficult as a result. Mindful of this reality, courts have found that commingling can itself be evidence of money laundering and have found that the purpose of money laundering statutes indicates direct tracing is not required. See e.g., United States v. Phythian, 529 F.3d 807, 813 (8th Cir. 2008) (citations and quotation marks omitted) ("Where a defendant commingles illegal proceeds with the identity or the funds of a legitimate and usually preexisting business ... [s]uch commingling effectively conceals the nature, source, ownership, and/or control of the unlawful proceeds"). In a money laundering case, the law only requires the state to prove that dirty money constituted a portion of the commingled funds that were maintained or deployed for a criminal purpose. See Lemoine, 15-1120 at 8, 222 So. 3d at 694-95.

---

[7] "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity [shall be punished for money laundering]." See 18 U.S.C. § 1956(a)(1)(A)(i).

25

In Lemoine, the Supreme Court granted writs to determine whether the evidence was sufficient to find that the defendant committed money laundering under La. R.S. 14:230(B)(2). The evidence at trial showed that the defendant, as president of Morel G. Lemoine Distributors, Inc. ("Morel"), executed a scheme by which he defrauded Union Pacific Railroad Company by billing the railroad for more fuel than was dispensed to it over a period of three years. Union Pacific's payments of the inflated invoices came in the form of checks that were deposited into Morel's business checking account. Although the scheme ceased in March 1998, when Union Pacific's own fueling facility became operational, the illegal activity did not come to light until 2002. Lemoine, 15-1120 at 2-3, 222 So. 3d at 691.

The Supreme Court found that Section (B)(2) of the money laundering statute applied to the case because the evidence showed, not only that defendant repeatedly stole from Union Pacific, but that he deposited those ill-gotten gains into his business account, in which he maintained an interest and from which he routinely transferred money to perpetuate and further his business operations, which functions involved the recurring thefts. Put another way, this was not a "garden variety" theft case but, rather, in light of the use of stolen money to finance future thefts, a prototypical money laundering case. See Lemoine, 15-1120 at 5-6, 222 So. 3d at 693.

Here, the defendant argues his conviction for money laundering must be reversed because he did not commit theft but, instead, transferred funds throughout various accounts as would any investment advisor. This argument is meritless. The trial testimony shows the defendant conducted numerous financial transactions involving proceeds known to be derived from criminal activity, which is theft by fraud. In furtherance of this criminal activity, the defendant attempted to conceal the fact he was the owner of Winston by placing addresses and phone numbers on

26

the annuity contracts that were associated with different annuity companies. The testimony and evidence further shows that over a period of a year or more, checks were given to the defendant from his clients for the purpose of making investments. After the checks cleared, the defendant transferred the clients' investment money from the Winston bank account to his other business and personal bank accounts, over which he had sole control. The defendant commingled the investment money with money he earned from his work and then used the money to make personal purchases and pay bills. There was no evidence that any of the purchases made or checks written by the defendant were investments for his clients. The transaction of transferring money from the deposits made by investors is theft. The crime of money laundering is, for all practical purposes, a process by which ill-gotten gains are commingled with clean funds and used to perpetuate criminal activity. Lemoine, 15-1120 at 11, 222 So. 3d at 697. Given the foregoing, the State met its burden of proving that the defendant engaged in money laundering. This assignment of error is without merit.

**CONVICTIONS AND SENTENCES AFFIRMED.**